580 P.2d 8

**REX FINANCIAL CORPORATION, a corporation, Appellant,**

v.

**MOBILE AMERICA CORPORATION, a Florida Corporation, Appellee.**

No. 1 CA–CIV 3385.

Court of Appeals of Arizona, Division 1, Department C.

March 14, 1978.

Rehearing Denied April 25, 1978.

Review Denied June 6, 1978.

Engdahl, Jerman & Estep by Dean Estep, Phoenix, for appellant.

Jennings, Strouss & Salmon by John E. Burger, John G. Sestak, Jr., Phoenix, for appellee.

OPINION

SCHROEDER, Judge.

This is a dispute between an inventory financer and a retail purchase money lender under Article 9 of the Uniform Commercial Code as adopted in Arizona; A.R.S. §§ 44–3101–3153. The trial court granted summary judgment in favor of the purchase money lender, and we affirm.

Appellant, Rex Financial Corporation, entered into an agreement with a mobile home dealer, Liberty Mobile Home Centers, Inc., to finance Liberty's purchase of its inventory of mobile homes. The agreement is the same as that in previous litigation before this Court, *Rex Financial Corp. v. Great Western Bank & Trust*, 23 Ariz.App. 286, 532 P.2d 558 (1975).

On February 7, 1972, Liberty entered into a contract with Mrs. and Mrs. Loren Fraze for the sale of one of the mobile homes. The Frazes agreed to purchase the home and executed both an installment purchase agreement and a security agreement. The security agreement gave Liberty a purchase money security interest in that mobile home. The purchase agreement recited

that even though physical delivery of the home might not be made until a later date, title to the home passed to the Frazes as of the time of the signing of the security agreement. Liberty then sold the security agreement to Great Western Bank for $7,892.00. Appellee, Mobile America Corporation, is the successor to Great Western's interest in that security agreement.

The Frazes did not, in fact, take possession of the mobile home that day, but pursuant to an understanding with Liberty as described by Mr. Fraze in his deposition, they decided to pick up the mobile home at a later date, when they would also make the down payment.

Liberty failed to repay Rex Financial before the Frazes could take possession, Rex Financial ceased doing business with Liberty and, acting under its inventory financing agreement, seized all of the mobile homes on Liberty's lot, including the Frazes' mobile home. Rex Financial eventually sold the mobile home.

Mr. Fraze, after returning to Liberty's lot and finding the mobile home gone, essentially abandoned any rights which he and his wife may have had under the purchase agreement, and Mobile America abandoned efforts to collect the purchase price from the Frazes. This case differs from *Rex Financial Corp. v. Great Western Bank & Trust*, in that here the parties are not claiming rights to the proceeds of the retail purchase agreement, but are claiming rights to the vehicle itself.

Mobile America brought this action against Rex Financial to recover the still unpaid amount advanced to purchase the Fraze security agreement. Mobile America asserted that the security agreement gave it an interest in the mobile home as collateral, and that Rex Financial was guilty of conversion in seizing and disposing of the home. Rex Financial responded that its inventory financing agreement with Liberty gave it a security interest enforceable against the mobile home, and, further that the transaction between the Frazes and Liberty was insufficient to create an enforceable purchase money security interest.

Rex Financial appeals from entry of summary judgment against it.

In this appeal, the parties essentially acknowledge that the right of Rex Financial, as an inventory lender, to enforce its security agreement against the mobile home itself would have been cut off by Liberty's resale to a customer in the ordinary course of business. A.R.S. § 44–3128(A) (U.C.C. § 9–307(1)). The parties also acknowledge that in order for a security interest to have attached under the Fraze security agreement, value had to have been given and the Frazes had to have rights in the collateral, the mobile home. A.R.S. § 44–3116 (U.C.C. § 9–203), formerly A.R.S. § 44–3117 (U.C.C. § 9–204).

Rex Financial's position here is that, because the Frazes did not take possession of the mobile home and give a down payment at the time the purchase money security agreement was executed, they were not buyers in the ordinary course of business. Additionally, Rex Financial argues that no valid security interest attached under the purchase money security agreement sought to be enforced by Mobile America as assignee.

Virtually identical arguments were faced and rejected by a New York court in *Chrysler Credit Corp. v. Sharp*, 56 Misc.2d 261, 288 N.Y.S.2d 525 (1968). There, the court held that a buyer who executed a retail installment sales contract and a security agreement was still a buyer in the ordinary course of business even though she had not made the down payment required by the sales contract or taken possession. The court also held that the buyer's binding promise to pay was sufficient to meet the requirements for attachment of a security interest. The court found that the seizure and sale of the collateral was a conversion.

The same result was also reached by a Georgia court in a factual situation very similar to this one. *International Harvester Credit Corp. v. Associates Financial Services Co., Inc.*, 133 Ga.App. 488, 211 S.E.2d 430 (1974).

Appellant attempts to distinguish the *Chrysler* case on the ground that the debtor there left a vehicle with the dealer as a trade-in, even though in that case, as in this case, no down payment had been made and the debtor had not taken possession at the time the security agreement was signed. We do not find the distinction material. The trade-in merely illustrated that the debtor acted in good faith in agreeing to purchase the vehicle. The good faith of the Frazes is not disputed.

Appellant's more fundamental contention with respect to *Chrysler* is that the court should have held there was no retail sale because the debtor never took possession of the collateral. Appellant thus contends that the *Chrysler* case was wrongly decided. We disagree with appellant and agree fully with the philosophy expressed by the *Chrysler* court that a good faith purchaser who signs such a purchase money security agreement should be considered a buyer in the ordinary course "without regard to the technicalities of when title is to pass pursuant to collateral oral agreements or as to time of delivery . . . ." 288 N.Y.S.2d at 534. *See also International Harvester Credit Corp.* which quoted *Chrysler* with approval in this same connection. 211 S.E.2d at 435. If this result exposes an inventory financer to certain risks, they are risks which he is in a better position to guard against than the retail financer. *See Skilton,* A Buyer in the Ordinary Course of Business under Article 9 of the Uniform Commercial Code, 1974 Wis.L.Rev. 1, 76–88. We, therefore, conclude in this case that the Frazes were purchasers in the ordinary course of business and that a security interest attached when they executed the installment purchase agreement and the security agreement.

We also reject appellant's suggestion that A.R.S. § 44–3113 (U.C.C. § 9–113) [1] requires that possession in the debtor is a prerequisite to the creation of a valid security interest capable of being transferred for value. That section pertains only to a security interest of a seller of goods who retains possession of the goods, and has no bearing on the rights of the creditors involved here.

The judgment is affirmed.

DONOFRIO, P. J., and OGG, J., concurring.

---

1. "§ 44–3113. Security interests arising under article on sales

A security interest arising solely under the article on sales (article 2) is subject to the provisions of this article except that to the extent that and so long as the debtor does not have or does not lawfully obtain possession of the goods:

1. No security agreement is necessary to make the security interest enforceable; and
2. No filing is required to perfect the security interest; and
3. The rights of the secured party on default by the debtor are governed by the article on sales (article 2)."