In re ENERGY COOPERATIVE, INC., Delaware corporation, Debtor.

ENERGY COOPERATIVE, INC., Debtor in Possession, et al., Plaintiffs,

v.

The PERMIAN CORPORATION, et al., Defendants.

Nos. 85 C 3536, 81 B 5811, and 81 A 2075.

United States District Court, N.D. Illinois, E.D.

Aug. 22, 1988.

Barbara Bertok, Stuart M. Rozen and Mary T. Donahue, Mayer, Brown and Platt, Chicago, Ill., for banks.

Matthew J. Botica, Mary Kay McCalla, Hopkins and Sutter, Chicago, Ill., for trustee.

Ronald L. Rose of Dykema Gossett, Detroit, Mich., for Total Petroleum.

Chester H. Foster, Jr. (Local Counsel), Arnstein, Gluck, Lehr and Milligan, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

KOCORAS, District Judge:

This matter is presently before the court on the motion of Jay A. Steinberg, Trustee for the Estate of Energy Cooperative, Inc. (the "Trustee"), and Continental Illinois National Bank and Trust Company of Chicago ("Continental Bank"), as agent for Continental Bank (as administrator for the Federal Deposit Insurance Corporation, in its corporate capacity ("FDIC"), as successor in interest to Continental Bank in its individual capacity), First National Bank of Minneapolis, Seattle–First National Bank, Bank of Montreal, The First National Bank of Boston, Consolidated Asset Management Company (as administrator for the FDIC as successor in interest to First National Bank and Trust Company of Oklahoma City), and St. Louis Bank for Cooperatives (collectively, the "Banks"), for summary judgment in their favor and against Total Petroleum, Inc. ("Total") on Counts II and III of their complaint and on Total's counterclaim. Also before the court is Total's cross-motion for summary judgment on Counts I and II of its counterclaim. For the reasons stated herein, the motion of the Trustee and Continental Bank is granted; Total's motion is denied.

## FACTS

Energy Cooperative, Inc. ("ECI") was a corporation in the business of purchasing, selling, storing, and refining various petroleum products, which filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code on May 15, 1981. Both prior and subsequent to filing its petition, ECI borrowed money from the Banks. As security for those loans Continental Bank obtained, for the benefit of the Banks, a continuing security interest in, among other things, all ECI's then-existing or after-acquired inventory, including all oil, petroleum and gasoline products and by-products wherever located, and all proceeds resulting from the sale or disposition of any inventory. It is undisputed that Continental Bank properly perfected its security interest pursuant to § 9–302 of the Uniform Commercial Code ("UCC").

Total and ECI entered into three written Exchange Agreements for exchanges of oil and gasoline dated August 29, 1979, October 7, 1980, and March 25, 1981, respectively. Each of the Exchange Agreements provides that ECI will deliver a specified quantity of oil and gasoline to Total; and that ECI will receive from Total the same quantity of petroleum products, although not always of the same product description as that to be delivered by ECI. Each of the Exchange Agreements also provides, in part:

1. EXCHANGE: Unless the contrary is provided by the express terms hereof, this Agreement constitutes an even and current exchange of products and each party will endeavor to keep the exchange in reasonable balance at all times. · If at any time, or from time to time, this exchange shall be out of balance in an amount which the party who has delivered in excess of the quantity which he has received considers to be unreasonable, such over-delivered party shall have the right to either (a) suspend further deliveries or (b) limit the amount of further deliveries to be made by it until such times as the deliveries to each party have been brought into approximate balance. Upon termination, if the exchange is not in balance, the over-delivered party may continue to draw from the other party until the exchange is brought into balance. If the exchange cannot thus be brought into balance, settlement will be effected by delivery of products at some other destination or destinations or cash settlement will be made, in either instance on terms to be mutually agreed upon.

\*   \*   \*   \*   \*   \*

6. TITLE: Title to products delivered into tank trucks, barges, tanker, terminals or pipe lines shall pass when and as the products pass the intake pipe of such facility, and title to products delivered into tank cars shall pass when the carrier accepts such tank cars for shipment. From the time of delivery by one party to the other of products under this Agreement, the recipient party shall be solely responsible for loss, damage or expense to members of the public for personal injuries including death of, or property damage, caused by possession, consumption or use of the products exchanged under this Agreement.

\*   \*   \*   \*   \*   \*

8. TAXES: Unless otherwise provided herein or required by law, any direct taxes or other direct governmental charges and fees upon the delivery of the products hereunder, imposed by Federal, state or local governments, shall be for the account of the receiving party and such receiving party shall reimburse the delivering party for such direct taxes, charges or fees required to be paid by such delivering party in respect of delivery of such products by it. . . .

9. WARRANTY: Each party warrants title to the products delivered hereunder by such party, that such party has the right to sell such product and that it is free from liens and adverse claims of every kind. . . .

Upon termination of the Exchange Agreements, Total had delivered to ECI 1,252,299 gallons of petroleum products more than ECI had delivered to Total. On May 19, 1981, Total made a written demand for reclamation of 49,998 gallons of product

delivered to ECI during the preceding ten-day period. By order of the bankruptcy court, the petroleum products at issue have been sold. The present dispute concerns the parties' interests in the proceeds of that sale.

## DISCUSSION

The Trustee and Continental Bank contend that they are entitled to summary judgment in their favor and against Total on Counts II and III of their complaint and on Total's counterclaim because Total is merely an unsecured creditor of ECI whose interests are inferior to Continental Bank's valid, perfected security interest in all of ECI's inventory. In its six-count counterclaim, Total asserts a prior and/or superior right to the disputed petroleum under theories of industry practice, custom and usage; bailment; agency; "special property" interest; and, reclamation. Total has made a cross-motion for summary judgment in its favor on Counts I and II of its counterclaim contending that the disputed petroleum was merely bailed to ECI, therefore, Continental Bank's security interest could not attach thereto; or, alternatively, that the disputed petroleum was sold to Total in the ordinary course of business, free of any lien granted by ECI to Continental Bank. Under Illinois choice of law principles, Michigan law governs the outcome of this dispute because the contracts in issue were to be performed in more than one state and they were executed when accepted by Total in Michigan. *See, e.g., DP Serv., Inc. v. AM Intern.*, 508 F.Supp. 162, 164 (N.D.Ill. 1981); *Boise Cascade Home & Land v. Utilities, Inc.*, 127 Ill.App.3d 4, 82 Ill.Dec. 180, 186, 468 N.E.2d 442, 448 (1st Dist. 1984).

■ Total's first argument is that the Exchange Agreements were bailment contracts, not contracts for sale, and therefore, title to the disputed products never passed to ECI and Continental Bank's security interest could not attach thereto. In support of this argument, Total primarily relies on *In re Fuel Oil Supply and Terminaling, Inc.*, 72 B.R. 752 (S.D.Tex.), *rev'd on other grounds*, 837 F.2d 224 (5th Cir.1988) (*"Fosti"*), in which the district

court held that the intent of the parties to establish a bailment and not a sale was manifest on the face of the unambiguous "loan or exchange agreement" before it. *Id.* at 759. Although the Trustee and Continental Bank persuasively argue that *Fosti* should not be followed because it was incorrectly decided, we need not and do not express any view regarding the propriety of the *Fosti* decision. *Fosti* is inapposite to our decision in this case both because it is at odds with controlling Michigan law and, moreover, because in this case we find that the unambiguous terms of the Exchange Agreements establish that the intent of the parties was to effect sales.

In Michigan, " 'the term (bailment) may be said to import the delivery of personal property by one person to another in trust for a specific purpose, with a contract ... that the trust shall be faithfully executed and the property returned or duly accounted for when the special purpose is accomplished, or kept until the bailor reclaims it.' " *In re George L. Nadell & Co.*, 294 Mich. 150, 292 N.W. 684, 686 (1940), *quoting*, 6 Am.Jur. pp. 140–141. The distinction between a bailment and a sale often turns upon whether the identical item is to be returned or merely something of like value. *See, e.g., Powder Co. v. Burkhardt*, 97 U.S. 110, 116, 24 L.Ed. 973 (1877); *Edgar v. Parsell*, 184 Mich. 522, 151 N.W. 714, 715 (1915). In any event, if the parties intend to transfer title to the property, the transaction is a sale. *Sturm v. Boker*, 150 U.S. 312, 330, 14 S.Ct. 99, 104, 37 L.Ed. 1093 (1893).

Under each of the three Exchange Agreements in issue, ECI was to deliver a certain quality and quantity of petroleum products to Total and Total was to deliver a certain quality and quantity of petroleum products to ECI. The parties agreed to maintain the volume delivered by each party to the other in reasonable balance and to invoice any small balance owing to either party at the termination of the agreement at a mutually satisfactory price. The agreements further provided that title to the products delivered would pass to the receiving party when the product passed a

designated delivery point and that taxes or other governmental charges on delivery would be the responsibility of the receiving party. Additionally, each agreement provided that, from the time of delivery, the recipient party was solely liable for any harm to the public caused by the product; that each party warranted title to the product it delivered; and, that each party would pay all sums due on production, processing, or handling of the products it delivered and would indemnify the recipient party against any charges upon the product on account of adverse claims thereto or of royalties applicable before or upon delivery.

Those provisions taken as a whole clearly establish that it was the intent of the parties under each agreement to sell a quantity of that party's product for the price of a quantity of the other party's product. Under this arrangement either party could be seller/creditor or buyer/debtor at any given time depending on the balance of the exchanges. Nothing in the agreements could be construed as limiting the recipient party's right to deal with the products delivered in any manner it pleased, nor as reserving a right in the delivering party to reclaim the product once delivered. Rather, the agreements expressly and unambiguously provide that title to the product, as well as liability for taxes, delivery charges, and public harm—in other words, ownership—would pass to the recipient party at a defined point of delivery. Under the Roman or continental law, arrangements such as those at issue here would fall under the classification of a mutuum, however, because there is a transfer of title to the product delivered, it is regarded as a sale in our system of jurisprudence. *See* 8 Am. Jur.2d *Bailments* § 48 (1980).

■■■■ Total argues that this court should look to ECI's accounting methods to conclude that the Exchange Agreements contain latent ambiguities and that the true intention of the parties was to establish bailments. First, we find ECI's choice of accounting methods irrelevant to the question of whether the transactions were bailments or sales. Mere bookkeeping proce-

dures are not legal determiners of title, especially in the face of the express provisions of the contracts as noted above. *See Crocker Nat. Bank v. Ideco Div. of Dresser Indus.,* 839 F.2d 1104, 1107 (5th Cir. 1988). Second, even under Michigan's lenient parol evidence rule, parol evidence which is contradictory to the written language of a contract is inadmissable. *County of Oakland v. City of Detroit, Etc.,* 81 Mich.App. 308, 265 N.W.2d 130, 133–34 (1978). As stated earlier, the contracts in their entirety indicate a clear intent to transfer title which makes the transactions sales. Thus, even if ECI's accounting method tended to show that ECI regarded the transactions as bailments, that evidence would be inadmissable as it would not only contradict, but would render meaningless, entire provisions of the contracts (i.e. passage of title, warranty of title, and liability for taxes, delivery charges, and public harm). The unambiguous language of the agreements in issue evidence an intent to transfer title and all consequent incidents of ownership, and this establishes a sale, regardless of how the parties' bookkeepers made note of the credits or debits arising from such sales. In sum, the agreements effected sales and ECI is a debtor with regard to any product or sum owing Total under those agreements.

■■■ Total's second argument seeks to invoke the protection of Mich.Com.Laws § 440.9307(1) ("§ 9–307(1)") which provides: "... a buyer in ordinary course of business, as defined in section 1201(9), takes free of a security interest created by his or her seller even though the security interest is perfected and even though the buyer knows of its existence." Total contends that it became a "buyer in ordinary course of business" of the disputed petroleum as soon as the contracts for sale were executed. We disagree.

Mich.Com.Laws § 440.1201(9) defines "buyer in ordinary course of business" as:

a person who in good faith and without knowledge that the *sale* to him or her is in violation of the ownership rights or security interest of a third party in the

goods buys in ordinary course from a person in the business of selling goods of that kind.... 'Buying' may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a preexisting contract for sale.... (emphasis added).

The Trustee and Continental Bank contend that Total cannot be a "buyer in ordinary course of business" because no "sale" has occurred. "Sale" is defined as "the passing of title from the seller to the buyer for a price." Mich.Com.Laws § 440.2106(1). Total does not and could not contend that title to the disputed petroleum passed to it upon execution of the contract; rather, it argues that under § 9–307(1) passage of title is irrelevant. Total bases this argument on two Illinois Appellate Court cases, *Herman v. First Farmers State Bank of Minier*, 73 Ill.App.3d 475, 29 Ill.Dec. 787, 392 N.E.2d 344 (1979), and *Wilson v. M & W Gear*, 110 Ill.App.3d 538, 66 Ill.Dec. 244, 442 N.E.2d 670 (1982), which held that one who contracts to buy goods and pre-pays the purchase price is a "buyer" without regard to the existence, identification, or passage of title of the goods. Under the *Herman/Wilson* approach, the only relevant inquiry is whether the transaction occurred "in ordinary course of business." We disagree with the approach taken in those cases. Even accepting the *Herman/Wilson* position that passage of title is irrelevant to defining "buyer in ordinary course," the absolute threshold requirement for obtaining any present interest in goods is that they are "both existing and identified." Mich.Com.Laws § 440.2105(2). By eliminating these requirements and finding plaintiffs entitled to § 9–307(1) protection, the *Herman* and *Wilson* courts not only granted plaintiffs an interest in the goods, they gave plaintiffs an interest superior to that of a prior creditor with a valid, perfected security interest in the same goods. As stated in the dissent in *Wilson*, "the majority opinion ... makes the concept of security on inventory an entirely unworkable concept." *Wilson, supra*, 66 Ill.Dec. at 253, 442 N.E.2d at 679 (Heiple, J., dissenting). We hold that one

cannot be a "buyer in ordinary course" unless a "sale" has occurred. A "sale" occurs when title passes, and in no event can title to the goods pass unless they are both existing and identified. *See Kinetics Tech. Intern. Corp. v. Fourth Nat. Bank*, 705 F.2d 396 (10th Cir.1983); *Abbott v. Blackwelder Furniture Co.*, 33 B.R. 399, 405–06 (W.D.N.C.1983); *Wilson, supra*, 66 Ill.Dec. at 249–54, 442 N.E.2d at 675–680 (Heiple, J., dissenting); *Russell v. Transamerica Ins. Co.*, 116 Mich.App. 93, 322 N.W.2d 178 (1982). *See also*, J. White & R. Summers, *Uniform Commercial Code* 1067–68 n. 82 (2d ed. 1980) (generally, § 9–307(1) protection given only if completed "sale" has occurred).

At the time Total and ECI executed the Exchange Agreements, the petroleum products were not identified to the contract. Moreover, the parties expressly agreed that title would pass upon delivery. It is uncontroverted that ECI never delivered the disputed petroleum. Consequently, title never passed; no "sale" occurred; and, Total is not a "buyer" of the disputed petroleum "in ordinary course of business" or otherwise. Accordingly, Total is not entitled to the protection of § 9–307(1) and its motion for summary judgment on Counts I and II of its Counterclaim is denied.

■ Turning now to the Trustee's and Continental Bank's motion, as stated above, the Exchange Agreements clearly constitute contracts for sale under which either party could be seller/creditor or buyer/debtor at any given time depending on the current exchange balance. When Total delivered the disputed petroleum to ECI, title thereto passed to ECI and Continental Bank's undisputedly valid, perfected security interest attached thereto. It is also undisputed that Total did not perfect a security interest in the products it delivered. Therefore, Continental Bank's interest in the petroleum is clearly superior to Total's interest as an unsecured creditor. Mich. Com.Laws § 440.9312. Thus, the Trustee and Continental Bank are entitled to summary judgment on Counts II and III of their Complaint.

■ They are also entitled to summary judgment on Counts I, II and III of Total's Counterclaim. There is absolutely no evidence of industry practice, custom, or usage establishing a right in Total to possession of the disputed petroleum, nor any evidence tending to show an agency relationship between Total and ECI. Moreover, the plain language of the Exchange Agreements belies the constructions urged in Counts I–III of Total's Counterclaim.

■ In Count IV of its Counterclaim, Total alleges that it is entitled to possession of a portion of the disputed petroleum under Mich.Com.Laws § 440.2502. Ignoring numerous other defects in this theory, it is enough to note that § 2–502 protection cannot attach unless the goods are both existing and identified as goods to which the contract refers. Mich.Com.Laws § 440.2501. There is some dispute over whether the goods were existing when the contracts were made, but it is uncontroverted that no portion of ECI's inventory was ever identified as the goods to which the Exchange Agreements referred. Accordingly, the Trustee and Continental Bank are entitled to summary judgment on Count IV of Total's Counterclaim.

■ In Counts V and VI of its Counterclaim, Total alleges that it has a right to reclaim a portion of the disputed petroleum pursuant to Mich.Com.Laws § 440.2702(2). That section provides:

> Where the seller discovers that the buyer has received goods on credit while insolvent he may reclaim the goods upon demand made within 10 days after the receipt, but if misrepresentation of solvency has been made to the particular seller in writing within 3 months before delivery the 10 day limitation does not apply. Except as provided in this subsection the seller may not base a right to reclaim goods on the buyer's fraudulent or innocent misrepresentation of solvency or of intent to pay.

*Id.* It is undisputed that Total made a written demand for reclamation on May 19, 1981. However, because ECI is a debtor in bankruptcy, Total's exclusive remedy as a reclaiming seller is under § 546(c) of the Bankruptcy Code, 11 U.S.C. § 546(c). *See, e.g., In re Rozel Industries, Inc.,* 74 B.R. 643, 645 (N.D.Ill.1987), and cases cited therein; *In re Flagstaff Foodservice Corp.,* 56 B.R. 899, 908 (S.D.N.Y.1986). § 546(c) provides, in part:

> The rights and powers of the trustee under section 544(a), 545, 547, and 549 of this title are subject to any statutory right or common-law right of a seller, in the ordinary course of such seller's business, of goods to the debtor to reclaim such goods if the debtor has received such goods while insolvent, but—
>
> > (1) such a seller may not reclaim any such goods unless such seller demands in writing reclamation of such goods before ten days after receipt of such goods by the debtor....

Count VI of Total's Counterclaim alleges that ECI made written misrepresentations of solvency and therefore seeks § 2–702(3)'s extended reclamation period. § 546, however, does not provide for any extensions; thus, the Trustee and Continental Bank are entitled to summary judgment on Count VI without further analysis. As to Count V, assuming *arguendo,* that Total could prove all the elements necessary to entitle it to reclaim the goods sold to ECI during the ten-day period prior to May 19, 1981, Total's rights to such products would still be inferior to the rights of Continental Bank as a holder of a valid, perfected security interest in the goods. Mich.Com.Laws § 440.2702(3). *See Matter of Samuels & Co., Inc.,* 526 F.2d 1238 (5th Cir.1976). *Cf. Crocker Nat. Bank, supra. See also* White & Summers, *supra,* § 24–9. Accordingly, the Trustee and Continental Bank are also entitled to summary judgment on Count V of Total's Counterclaim.

In conclusion, the unambiguous terms of the three Exchange Agreements establish that the agreements were contracts for the sale of petroleum products. It is undisputed that Total failed to perfect a security interest in the disputed petroleum and that Continental Bank had, at all relevant times, a valid, perfected security interest in all of ECI's inventory, including the disputed petroleum. Therefore, Total is merely an

unsecured creditor of ECI whose interests in the disputed petroleum are inferior to those of Continental Bank. Accordingly, Total's motion is denied and the Trustee's and Continental Bank's motion is granted.